# EXHIBIT A

AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

| LODGED |
| CLERK, U.S. DISTRICT COURT |
| 10/2/2025 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ___RYO___ DEPUTY |

# UNITED STATES DISTRICT COURT

for the
Central District of California

United States of America

v.

Ronald Alexis Coreas, Junior Roldan, Elmore Sylvester Cage, Balto Montion, Jesus Gonzalez Hernandez Jr., Hector Daniel Ramos, Stefano Deong Green, Yachua Mauricio Flores, and Ismael Vega.

Case No.    2:25-mj-06126-DUTY

# CRIMINAL COMPLAINT BY TELEPHONE
# OR OTHER RELIABLE ELECTRONIC MEANS

I, George Maloney, the complainant in this case, state that the following is true to the best of my knowledge and belief.  On or about the date of June 8, 2025, in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 231(a)(3) | Obstructing, Impeding, and Interfering with Law Enforcement During a Civil Disorder |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/*
*Complainant's signature*

George Maloney, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    October 2, 2025
_____

_____
*Judge's signature*

City and state:    Los Angeles, California
_____

Hon. Karen Stevenson, U.S. Magistrate Judge
*Printed name and title*

AUSA:__Neil Thakor x 6595

## <u>AFFIDAVIT</u>

I, George Maloney, being duly sworn, declare and state as follows:

### I.    <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of a criminal complaint against, and arrest warrants for, Ronald Alexis Coreas ("COREAS"), Junior Roldan ("ROLDAN"), Elmore Sylvester Cage ("CAGE"), Balto Montion ("MONTION"), Jesus Gonzalez Hernandez Jr. ("HERNANDEZ"), Hector Daniel Ramos ("RAMOS"), Stefano Deong Green ("GREEN"), Yahua Mauricio Flores ("FLORES"), and Ismael Vega ("VEGA") (collectively the "Target Subjects") for violations of 18 U.S.C. § 231(a)(3) (Obstructing, Impeding, and Interfering with Law Enforcement During a Civil Disorder).

### II.    <u>BACKGROUND OF AFFIANT</u>

2.    I am a Special Agent ("SA") with the Federal Bureau of Investigation and have been so employed since January 2016.  I am currently assigned to a violent crimes squad in Los Angeles responsible for investigating kidnappings, robberies, extortions, aggravated threats, and assaults on federal officers.  From August 2020 to June 2025, I was assigned to a civil rights squad in Los Angeles where I investigated civil rights violations to include deprivation of rights under color of law, hate crimes, and conspiracies.  Prior to that, from February 2017 to August 2020, I was assigned to the counterintelligence division of the FBI where I investigated espionage, foreign intelligence activities, malign foreign influence, and provided operational support for the intelligence

community.  After my graduation from the FBI Academy in June
2016, and until February 2017, I investigated white collar
crimes, including wire fraud, healthcare fraud, and public
corruption.

3.    As an FBI Special Agent, I have received training in a
variety of investigative and legal matters.  I am familiar with
and have used various investigative techniques, including search
warrants, court-authorized interception of wire, oral, and
electronic communications, pen registers/trap and trace orders,
telephone toll analysis, physical and electronic surveillance,
confidential sources, cellular telephone analysis, grand jury
proceedings, asset forfeiture, and many other investigative
tools.  Through my training, experience, and interaction with
other law enforcement officers, targets, subjects, and
witnesses, I am familiar with the motivations of, and methods
employed by, individuals who commit violent crimes, wire fraud,
extortion, assault, kidnapping, and other criminal violations.

### III.    SUMMARY OF PROBABLE CAUSE

4.    In early June 2025, federal law enforcement officials
began conducting immigration enforcement operations throughout
the Los Angeles area.  During and following those operations,
protests occurred in and around downtown Los Angeles,
California.  While many of the protestors peacefully exercised
their First Amendment rights to protest, some individuals
directly engaged in violent actions to obstruct, impede, or
interfere with law enforcement officers.  Many of those actions
occurred during a civil disorder as defined by 18 U.S.C.

§ 232(1), and obstructed, delayed, and adversely obstructed

commerce, the movement of articles and commodities in commerce.

    5.    Specifically, on June 8, 2025, protestors walked onto

the United States Highway 101 (the "101") near Main Street in

Los Angeles and blocked all lanes of travel.  California Highway

Patrol ("CHP") officers responded to that location in patrol

vehicles, pushed the protestors off the freeway, and remained

there to prevent the protestors from re-entering.  By remaining

on the freeway, the CHP officers and their vehicle were

positioned under and between the Main Street and Los Angeles

Street overpasses of the 101 ("the overpasses"), as depicted

below:

**Main Street Overpass**





**Los Angeles Street Overpass**



6.    As the CHP officers stood on the 101, crowds gathered
on the Overpasses.  Some members of that crowd -- including the
Target Subjects -- threw rocks, bottles, and various other
objects at the CHP officers and CHP patrol cars below them.

7.    Through a review of law enforcement video, social
media, and other investigative methods, the Target Subjects were
identified as individuals who threw rocks, debris, accelerants,
or objects on fire at the CHP patrol cars.

## IV.   <u>STATEMENT OF PROBABLE CAUSE</u>

8.    Based on my review of law enforcement reports,
discussions with other investigators, my review of surveillance
videos, body-worn camera ("BWC") footage, social media videos,
and news reports, and my own involvement in the investigation, I
am aware of the following:

**A.    Civil Disorder Erupts during Protests in Downtown Los
Angeles on June 8, 2025**

9.    Beginning on or about June 6, 2025, protests sprung up
in and around Los Angeles in response to immigration enforcement
actions conducted by federal law enforcement.  As part of that
series of protests, on June 8, 2025, a large group of people
(estimated to be in the thousands) gathered in downtown Los
Angeles near federal government facilities, including the
Federal Building located at 300 North Los Angeles Street, the
United States Courthouse located at 312 North Spring Street, and
the Metropolitan Detention Center ("MDC") located at 535 North
Alameda Street (the "Federal Buildings").

10.    As the day progressed, agitators within the crowd
engaged in violent activity directed at private property,
government buildings, and both federal and local law enforcement
officers.  Multiple officers and agents from the Los Angeles
Police Department ("LAPD"), the Los Angeles Sheriff's
Department, CHP, the United States Marshals Service, and the FBI
were assaulted (some of the law enforcement assault victims
required medical attention).  Additionally, the Federal
Buildings were vandalized with graffiti and law enforcement
vehicles were damaged by protestors wielding blunt objects.

11.    Given the escalating acts of violence within the group
of protestors, at approximately 2:30 p.m., the LAPD Incident
Commander declared an unlawful assembly.  Law enforcement
broadcasted orders to disperse, but many protestors defied that
order and continued congregating near the Federal Buildings.

Then, at approximately 4:00 p.m., a large group of protestors entered the 101 via the Los Angeles Street offramp and shut down traffic in both directions on the freeway.[1]

12.  Since CHP is the law enforcement agency with primary jurisdiction over California freeways, CHP assumed responsibility for clearing the protestors from the 101. A group of CHP officers convened on the 101 and successfully pushed the protestors back up the Los Angeles Street offramp. Once the 101 was cleared of protestors, a group of CHP officers and CHP cars remained on the freeway below the Overpasses. At some point thereafter, individual protestors began throwing rocks, electric scooters, street signs, and various other objects at the CHP officers below. At one point, a protestor lit an object on fire, dropped the object onto a CHP car, and the car caught fire. The scene is captured in the photograph

---

[1] I am aware that U.S. Highway 101 is a major highway that runs from Southern California through Oregon and into Washington State. As such, I believe that the protestors' actions that caused the shutdown of the freeway in both directions affected interstate commerce. Additionally, I am aware that the violence that occurred at the protests on June 8, 2025 impacted critical functions of operations of the United States government, including by restricting access to, and causing the lock-down of, federal buildings and buildings containing federal employee offices.

below:



**B.    Initial Investigation of the Attack on CHP**

13.   In the aftermath of the events of June 8, 2025, federal and state law enforcement began investigating the identities of the protestors who threw rocks and other objects at CHP officers who were standing on the 101 under the Overpasses.  Investigators collected video of the incident from numerous sources, including:

        a.    Surveillance video recorded by cameras operated by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and provided to the FBI ("the ATF video");

        b.    Surveillance video recorded by cameras operated by the Los Angeles Police Department ("LAPD") and provided to the FBI ("the LAPD video"); and

c.    Open-source videos obtained by CHP and provided to the FBI, to include livestream videos posted on kick.com.

14.    Through review of the various videos of the incident, multiple persons were observed committing criminal acts of civil disorder, including throwing rocks and/or other large objects, and attempting to burn and/or contribute to the burning of a CHP patrol car.

## SUBJECT 1

15.    I have reviewed videos of the incident and observed that SUBJECT 1 wore a black sweatshirt and distinctive red gloves.  SUBJECT 1 threw a rock at CHP officers and is seen holding multiple large rocks in his hands:

  

## SUBJECT 2

16.    I have reviewed videos of the incident and observed that SUBJECT 2 wore Nike brand shorts, a white t-shirt, a black hat, and a black bandana over his nose and mouth.  SUBJECT 2

threw rocks at disabled CHP patrol cars and is seen holding
rocks in his hands:

  

**SUBJECT 3**

17.   I have reviewed photographs and video[2] that LAPD
obtained from SUBJECT 2's cell phone and later provided to the
FBI and observed that SUBJECT 3 wore a blue sweatshirt and blue
shorts with a yellow "Crenshaw" logo.  SUBJECT 3 threw rocks at
LAPD officers:

---

[2] I am aware that SUBJECT 2 was subsequently arrested by the
LAPD following separate criminal acts committed against LAPD
officers near the vicinity of the attack on CHP officers and
patrol cars.  SUBJECT 2 was identified as ROLDAN.  Based on
verbal and written consent provided by ROLDAN, and utilizing the
passcode provided by ROLDAN, investigators accessed the
photographs and videos of the phone.




**SUBJECT 4**

18.   I have reviewed videos of the incident and observed that SUBJECT 4 wore black clothing, a pink facemask, and distinctive alien-eyed sunglasses.   SUBJECT 4 threw large rocks and other objects at CHP officers:





**SUBJECT 5**

19.   I have reviewed videos of the incident and observed that SUBJECT 5 wore a white tank top, black pants, a black

Fedora, and had tattoos covering his arms.  SUBJECT 5 threw
rocks at CHP officers:

  

**<u>SUBJECT 6</u>**

    20.  I have reviewed videos of the incident and observed
that SUBJECT 6 wore a green shirt, tan shorts, and had a
distinctive grey beard and a tattoo on his neck.  SUBJECT 6
threw rocks at CHP officers:

  

**SUBJECT 7**

21.    I have reviewed videos of the incident and observed that SUBJECT 7 wore a black Umbro brand shirt, a black LAFC hat, and a white face covering.   SUBJECT 7 threw rocks at CHP officers:

  

**SUBJECT 8**

22.    I have reviewed videos of the incident and aftermath, and I observed that SUBJECT 8 wore a black shirt, a blue backpack, and had a blue bandana tied around his neck.   SUBJECT 8 also had his right upper arm exposed below his t-shirt sleeve, which revealed possible tattoos on his arm and hand. SUBJECT 8 stood on the Overpass directly above a CHP patrol car that had previously caught fire from burning objects thrown by other persons on the Main Street Overpass.   The fire was within feet of officers standing nearby, directly under the Main Street Overpass for protection.   SUBJECT 8 poured liquid from two clear plastic water bottles directly onto the area of the previously

burning fire at the front end of the patrol car, and the flames
immediately grew in size.

  

**SUBJECT 9**

23.  I have reviewed videos of the incident and observed
that SUBJECT 9 wore a blue t-shirt, gray sweatpants, dark shoes,
and a gray and black sling bag slung over his shoulder.  The
sling bag was partially open, exposing a dark object inside that
appeared to be an article of clothing.  SUBJECT 9 also had his
right upper arm/bicep exposed below his t-shirt sleeve, which
revealed a partial tattoo that appeared to be the letters "LA."

24.  SUBJECT 9 later wore a purple sweatshirt, the same
gray sweatpants, dark shoes and gray/black sling bag over his
shoulder.  Additionally, SUBJECT 9 wore a light-colored
facemask.  SUBJECT 9 stood next to SUBJECT 8 as SUBJECT 8 poured
the liquid onto the burning CHP patrol car, which appeared to
cause the flames to grow.  Later, SUBJECT 9 ignited a piece of
debris and threw it on or directly in front of that previously
burning CHP patrol car directly in front of him.  Within seconds

of SUBJECT 9 throwing/dropping the burning debris, the smoke from the previously lit fire on the CHP patrol car started to rise again.

  

 

 

C.    Identification of SUBJECTS 1 through 9 as the Target
      Subjects

**SUBJECT 1 is COREAS, SUBJECT 2 is ROLDAN, and SUBJECT 3 is CAGE**

25.    The FBI used facial recognition software through its
Facial Analysis, Comparison, and Evaluation System ("FACES") to
attempt to identify SUBJECT 1.   FACES identified COREAS as a
potential match for SUBJECT 1.   The FBI obtained COREAS's
California ("CA") Department of Motor Vehicles ("DMV") database
records and criminal history records.   I have reviewed those
records and learned that COREAS he was arrested by LAPD on June
8, 2025, which was the date of the attack on CHP.

I have compared COREAS' CA DMV photograph to photographs of
SUBJECT 1 and I observed similarities between SUBJECT 1 and
COREAS:

 

26.    I have reviewed LAPD's report for COREAS's June 8,
2025 arrest and learned the following:

a.    LAPD arrested COREAS along with ROLDAN and CAGE
following a traffic stop of a gray Nissan Sentra, in which all
three persons were occupants;

b.    Those officers stopped the Sentra after it left a separate incident in which one of the occupants threw an incendiary device at a skirmish line of LAPD officers.  That incident occurred in the area of Main Street and Cesar Chavez Avenue in Downtown Los Angeles, which is approximately a quarter mile from the Overpass where the attack on CHP occurred; and

c.    Based on verbal and written consent provided by ROLDAN, and utilizing the passcode provided by ROLDAN, investigators accessed the photographs and videos of the phone.

27.  I have reviewed the photographs and video of the incident and observed ROLDAN collecting and throwing rocks alongside COREAS.  LAPD photographed ROLDAN following his arrest.  I have reviewed ROLDAN's post-arrest photograph and observed that he was wearing the same clothes as SUBJECT 2.

 

28.    LAPD photographed CAGE following his arrest.  I have reviewed CAGE's post-arrest photograph and observed that he was wearing the same clothes as SUBJECT 3:

 

29.    For these reasons, I believe that SUBJECT 1 is COREAS, SUBJECT 2 is ROLDAN, and SUBJECT 3 is CAGE.

**SUBJECT 4 is MONTION**

30.    On or about June 10, 2025, the Santa Cruz County Sheriff's Office ("SCSO") in Santa Cruz, California received an anonymous tip regarding a protestor who engaged in violence against CHP officers on June 8, 2025.  The tipster observed videos posted on the "@seanbalto" Instagram account that depicted the person who appeared to be the owner of the Instagram account engaged in civil disorder in downtown Los Angeles on June 8, 2025.  The tipster screen-recorded the since-deleted Instagram videos and provided those recordings to SCSO. The tipster believed the name of the Instagram account holder was "Balto Montion."  SCSO determined the suspect was likely MONTION, as he had been previously arrested in Santa Cruz County and was listed as the owner of the "@seanbalto" Instagram account in a report documenting that arrest.

31.  The FBI obtained MONTION's CA DMV records and criminal history records.  I have compared MONTION's CA DMV photograph to photographs of SUBJECT 4 and I observed similarities between SUBJECT 4 and MONTION:

 

32.  Additionally, law enforcement searched open-source databases and learned that the Instagram account "@seanbalto" belonged to MONTION.  I have viewed photographs as well as live-stream video from the Instagram account "@seanbalto" that appeared similar to SUBJECT 4.  For these reasons, I believe that SUBJECT 4 is MONTION.

**<u>SUBJECT 5 is HERNANDEZ</u>**

33.  The FBI used facial recognition software through FACES to attempt to identify SUBJECT 5.  FACES identified HERNANDEZ as a potential match for SUBJECT 5.  The FBI obtained HERNANDEZ's Nevada ("NV") DMV records and criminal history records.  I have compared HERNANDEZ's NV DMV photograph to photographs of SUBJECT 5 and I believe that SUBJECT 5 is HERNANDEZ.

34.   Additionally, law enforcement searched open-source
databases found an Instagram account in username "@_junior5150."
Through those databases, law enforcement learned that the
Instagram account "@_junior5150" belonged to HERNANDEZ.  I have
viewed photographs on the Instagram account "@_junior5150" and
compared them with video of SUBJECT 5.  Photographs of
HERNANDEZ's face and his tattoos lead me to believe that
HERNANDEZ is SUBJECT 5:



35.   On June 22, 2025, CHP arrested HERNANEDZ, charging
him with multiple felonies for his attack on CHP, to include
attempted murder and assault with a deadly weapon.  I learned
from CHP detectives that following the arrest, CHP advised
Hernandez of his Miranda rights, which he waived and agreed to
be interviewed.  During the subsequent interview, Hernandez
admitted to throwing rocks at CHP officers and their property on
June 8, 2025.

  

 

**SUBJECT 6 is RAMOS**

36.    The FBI used facial recognition software through FACES to attempt to identify SUBJECT 6.  FACES identified RAMOS as a potential match for SUBJECT 6.  The FBI obtained RAMOS's CA DMV records and criminal history records.  I have compared RAMOS's CA DMV photograph to photographs of SUBJECT 6 and I believe that SUBJECT 6 is RAMOS.



37.   Additionally, law enforcement searched open-source databases found an Instagram account in username "@bunny.eastwood."  Through those databases, law enforcement learned that the Instagram account "@bunny.eastwood" belonged to RAMOS.  I have viewed photographs on the Instagram account "@bunny.eastwood" and compared them with video of SUBJECT 6.  Photographs of RAMOS's face and his tattoos lead me to believe that RAMOS is SUBJECT 6:

 



//

//

**SUBJECT 7 is GREEN**

38.   The FBI used facial recognition software through FACES to attempt to identify SUBJECT 7.   FACES identified GREEN as a potential match for SUBJECT 7.   The FBI obtained GREEN's CA DMV records and criminal history records.   I have reviewed booking photographs taken of GREEN after his arrest in July, 2021.   I have compared GREEN's CA DMV and booking photographs to the videos of SUBJECT 7 and I believe that SUBJECT 7 is GREEN.



39.   Additionally, law enforcement searched open-source databases found an Instagram account in username "@kluermcfly_." Through those databases, law enforcement learned that the Instagram account "@kluermcfly_" belonged to GREEN.   I have viewed photographs on the Instagram account "@kluermcfly_" and compared them with video of SUBJECT 7.   Photographs of GREEN's face and tattoos lead me to believe that SUBJECT 7 is GREEN:



## SUBJECT 8 is FLORES

    40.  The FBI used facial recognition software through FACES
to attempt to identify SUBJECT 8.  FACES identified FLORES as a
potential match for SUBJECT 8.  The FBI obtained FLORES's CA DMV
records and criminal history records.  I have compared FLORES's
CA DMV photograph from 2022 and booking photographs from 2023 to
the videos of SUBJECT 8 and I observed similarities between
SUBJECT 8 and FLORES.  Additionally, I have observed booking
photographs from a 2023 arrest of FLORES which captured a tattoo
on his right arm that appeared to be the word "Esperanza" in
cursive, and a tattoo on his right hand that appeared to be a
dark filled-in rectangle.  SUBJECT 8 is captured during a
livestream video on the evening of June 8, 2025. The tattoo on
his right hand strongly resembles the photo of his tattoo taken
in 2023.

    41.  Both the design and placement of the FLORES's tattoo
appear to match that of the tattoos observed on SUBJECT 8.  For
these reasons, I believe that SUBJECT 8 is FLORES.

 

 

**<u>SUBJECT 9 is VEGA</u>**

42.  The FBI used facial recognition software through FACES
to attempt to identify SUBJECT 9.  FACES identified VEGA as a
potential match for SUBJECT 9.  The FBI obtained FLORES's CA DMV
records and criminal history records and learned that on
February 9, 2003, VEGA was arrested for, and later convicted of,
trespassing and building a fire, in violation of CA Penal Code
section 602(J).  I have compared VEGA's CA DMV photograph from
2022 to the videos of SUBJECT 9 and I observed similarities
between SUBJECT 9 and VEGA.  Additionally, I have observed a
booking photograph from a 2003 arrest of VEGA which captured a
tattoo on his right upper arm/bicep that appeared to be the
letters "LA."

  

43.   Both the design and placement of the VEGA's tattoo appear to match that of the tattoo observed on SUBJECT 9.   For these reasons, I believe that SUBJECT 9 is VEGA.

### IV.  **CONCLUSION**

44.   For the reasons described above, there is probable cause to believe that the Target Subjects committed violations of 18 U.S.C. § 231(a)(3) (Obstructing, Impeding, and Interfering with Law Enforcement During a Civil Disorder).

_____
/s/
George Maloney, Special Agent,
FBI

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 2nd day of
October, 2025.

_____
HONORABLE KAREN STEVENSON
UNITED STATES MAGISTRATE JUDGE